## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MADHI COLLINS, | : | No. 3:24cv1571 |
| | : | |
| Plaintiff | : | (Judge Munley) |
| | : | |
| v. | : | |
| | : | |
| CORRECTIONAL OFFICER KINER, | : | |
| <u>et al.</u>, | : | |
| | : | |
| Defendants | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

### <u>MEMORANDUM</u>

Plaintiff Madhi Collins ("Collins"), an inmate housed at all relevant times at the State Correctional Institution at Camp Hill, Pennsylvania ("SCI-Camp Hill"), commenced this civil rights action pursuant to 42 U.S.C. § 1983.  (Doc. 1).  The matter is proceeding via an amended complaint.  (Doc. 27).  Named as defendants are Correctional Officer Kiner, Correctional Officer Usher, Lieutenant Snyder, and Sergeant Schaeffer.

Presently pending is defendants' motion (Doc. 46) for summary judgment pursuant to Federal Rule of Civil Procedure 56.  For the reasons that follow, the court will grant defendants' motion and enter judgment in their favor

## I.    <u>Material Facts</u>[1]

On or about September 16, 2024, Collins filed the instant action.  (Doc. 47 ¶ 1; Doc. 57 ¶ 1).  The remaining claims are an Eighth Amendment excessive force claim against Kiner, and an Eighth Amendment failure to intervene claim against Snyder, Schaeffer, and Usher.  (<u>Id.</u> ¶ 2).

Collins was incarcerated at SCI-Camp Hill from July 23, 2019 to February 24, 2023.  (<u>Id.</u> ¶ 3).

On September 27, 2022, Collins and another inmate, Evans, engaged in a fight.  (<u>Id.</u> ¶ 4).  Defendants maintain that Schaeffer saw the fight and notified main control via radio.  (Doc. 47 ¶ 4(a)).  Defendants maintain further that Snyder arrived on the scene and conducted a briefing.  (<u>Id.</u> ¶ 4(b)).  Defendant Snyder supervised the escort team consisting of Schaeffer, Kiner, and Usher.  (Doc. 47 ¶ 4(b)(i); Doc. 57 ¶ 4(b)(i)).  Defendant Usher was operating the handheld camera.  (<u>Id.</u> ¶ 4(b)(ii)).  Defendants maintain that Kiner was on Collins' right-hand side with the tether and Schaeffer was on Collins' left-hand side.  (Doc. 47 ¶ 4(b)(iii)).  Collins was escorted to the body scanner without incident.  (Doc. 47 ¶ 5; Doc. 57

---

[1]  Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  LOCAL RULE OF COURT 56.1.  A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried.  <u>Id.</u>  Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts and supporting exhibits.  (Docs. 47, 57).

¶ 5). After Collins was body scanned, defendants assert that he was escorted to the dispensary without incident. (Doc. 47 ¶ 6). Collins asserts that he was taken to the infirmary before the dispensary. (Doc. 57 ¶ 6).

Medical staff then arrived to wash out Collins' eyes as he had been sprayed with Oleoresin Capsicum ("OC") spray. (Doc. 47 ¶ 7; Doc. 57 ¶ 7). Defendants assert that Collins refused further medical treatment after one eye was washed. (Doc. 47 ¶ 8). Collins counters that he did not refuse treatment but asked if warm water could be used to wash his eyes because the solution caused more burning. (Doc. 57 ¶ 8). Medical staff returned to clean Collins' face, allowed him to blow his nose, and took photos. (Doc. 47 ¶ 9; Doc. 57 ¶ 9). Collins was then escorted to the medical department without incident. (Id. ¶ 10).

Collins began arguing with staff about washing his eyes out. (Id. ¶ 11). Collins asserts that he argued with Snyder because he denied Collins' request to have a nurse wash his eyes with warm water. (Doc. 57 ¶ 11). Collins then threatened to spit in Snyder's face. (Doc. 47 ¶ 12; Doc. 57 ¶ 12). A spit hood was requested and placed on Collins' face due to the threat, and Collins continued to threaten and argue with staff. (Id. ¶ 13). Defendants assert that Collins also refused further medical assessment. (Doc. 47 ¶ 14).

Collins was then escorted to the Restrictive Housing Unit ("RHU"). (Doc. 47 ¶ 15; Doc. 57 ¶ 15). During the escort to the RHU, defendants assert that

3

Collins became non-compliant by turning towards the officers, not following orders, and being uncooperative and argumentative with staff.  (Doc. 47 ¶¶ 16, 17).  Collins asserts that Kiner provoked him by kicking the back of his sneaker and pushing him.  (Doc. 57 ¶¶ 16, 17).  During the altercation, defendants assert that Kiner instructed Collins to let go of his radio.  (Doc. 47 ¶ 17(a)).  Collins denies that he grabbed Kiner's radio.  (Doc. 57 ¶ 17(a)).  Kiner then placed Collins against the wall and instructed him to calm down while Collins argued with staff.  (Doc. 47 ¶ 18).  The officers attempted to resume the escort to the RHU, but Collins continued to argue with staff and refused to walk.  (Id. ¶ 19).  Collins asserts that he refused to walk due to Kiner's aggression.  (Doc. 57 ¶ 19).  Defendants maintain that the officers took Collins to the ground due to his non-compliance.  (Doc. 47 ¶ 20).  Collins counters that he refused to walk because they were approaching a stairwell, and he feared that Kiner was going to push him down the stairs.  (Doc. 57 ¶ 20).  Collins was placed on the ground in order to regain control, though Collins maintains that he did not pose a threat.  (Doc. 47 ¶ 21; Doc. 57 ¶ 21).  An officer then left to get leg shackles.  (Doc. 47 ¶ 22; Doc. 57 ¶ 22).

Kiner and Schaeffer were on top of Collins, restraining him.  (Id. ¶ 23).  Collins asserts that Kiner was striking him in the head, and the presence of the other officers obscured the camera view.  (Doc. 57 ¶ 23).

A non-party officer then placed the leg shackles on Collins. (Doc. 47 ¶ 24; Doc. 57 ¶ 24). Collins complained that he was dizzy, and a tooth was knocked out. (Id. ¶ 25). Snyder called for a nurse and a nurse arrived to assess Collins. (Id. ¶¶ 26, 27). Defendants assert that Collins threatened to harm staff, while Collins avers that he was severely agitated after being assaulted by Kiner. (Id. ¶ 28). Collins was brought to his feet for a medical assessment and escorted back to medical without incident. (Id. ¶¶ 29, 30). Collins was again assessed and treated in medical. (Id. ¶ 31). The treatment included washing Collins' face and placing ointment and a band-aid on his cheek. (Id. ¶ 31(a)).

Defendants assert that Collins remained argumentative and threatened staff. (Doc. 47 ¶ 32). Collins was then escorted to the RHU without incident. (Doc. 47 ¶ 33; Doc. 57 ¶ 33).

Collins' Allegations Against Kiner

Collins alleges that Kiner: (1) held the tether during the escort; (2) stepped on Collins' shoelace and caused Collins to jerk and stop walking; (3) yelled at Collins to keep moving; (4) stepped on Collins' shoelace again and yelled at Collins; (5) slammed Collins between the wall and laundry bin; (6) grabbed Collins by both ankles, pulled Collins' legs backwards, and made Collins fall face first on floor; and (7) jumped on Collins, hit Collins in the head and face, and placed an elbow on Collin's neck. (Id. ¶ 34).

5

Defendants assert that Collins cannot produce competent admissible evidence that: (1) Kiner stepped on his shoelace; (2) Kiner slammed him between a wall and laundry bin; (3) Kiner grabbed his ankles and pulled his legs backwards; and (4) Kiner hit Collins in his head and face.  (Doc. 47 ¶ 34(a)-(d)). Collins counters that he can produce such competent admissible evidence through "the allegations of the Amended Complaint which are treated as 'admission[s] on file[.]'" (Doc. 57 ¶ 34(a)).

Defendants further assert that Collins cannot produce any competent admissible evidence that Kiner used excessive force against him as follows: (1) Collins cannot produce any competent admissible evidence that there was no need for the application of force shown by Kiner; (2) Collins cannot produce any competent admissible evidence that the amount of force used by Kiner was not reasonable based on the need for force; (3) Collins cannot produce any competent admissible evidence that he received any non de minimis injury from Kiner's use of force; (4) Collins cannot produce any competent admissible evidence that there was no threat to staff or inmate safety due to Collins' actions; and (5) Collins cannot produce any competent admissible evidence that there were no efforts made to temper the severity of Kiner's response.  (Doc. 47 ¶ 35(a)-(e)).  Collins counters that he "can produce admissible evidence that Kiner

used excessive force against him through allegations of the Amended Complaint." (Doc. 57 ¶ 35).

Collins' Allegations Against Snyder

Collins alleges that Snyder was the supervising officer for the escort. (Doc. 47 ¶ 36; Doc. 57 ¶ 36).

Defendants maintain that Collins cannot produce competent admissible evidence that Snyder failed to intervene in any unreasonable use of force because he: (1) cannot produce competent admissible evidence that Snyder witnessed another's use of excessive force; (2) cannot produce competent admissible evidence that Snyder had a reasonable opportunity to intervene on any use of excessive force; (3) cannot produce competent admissible evidence that Snyder refused to intervene; and (4) cannot produce competent admissible evidence there was a realistic and reasonable opportunity to intervene. (Doc. 47 ¶ 37(a)-(D)). Collins counters that he "can produce admissible evidence that Lt. Snyder f[a]iled to intervene in the unreasonable use of force of Kiner in the form of 'admission[s] on file[.]'" (Doc. 57 ¶ 37).

Collins' Allegations Against Schaeffer

Collins alleges that Schaffer was operating the handheld camera that recorded the escort. (Doc. 47 ¶ 38; Doc. 57 ¶ 38). However, the parties now

agree that Collins cannot produce competent admissible evidence that Schaeffer was operating the handheld camera.  (Id. ¶ 38(a)).

Defendants maintain that Collins cannot produce competent admissible evidence that Schaeffer failed to intervene in any unreasonable use of force because he: (1) cannot produce competent admissible evidence that Schaeffer witnessed another's use of excessive force; (2) cannot produce competent admissible evidence that Schaeffer had a reasonable opportunity to intervene on any use of excessive force; (3) cannot produce competent admissible evidence that Schaeffer refused to intervene; and (4) cannot produce competent admissible evidence that there was a realistic and reasonable opportunity to intervene.  (Doc. 47 ¶ 39 (a)-(d)).  Collins counters that he "can produce admissible evidence that Schaeffer fa[i]led to intervene in the unreasonable use of force by Kiner because he was actually on top of Collins along with Kiner." (Doc. 57 ¶ 39).

Collins' Allegations Against Usher

Collins alleges that Usher was the other escorting officer who left the scene to get leg shackles, putting them on extremely tight.  (Doc. 47 ¶ 40).  However, the parties now agree that Collins cannot produce competent admissible evidence that Usher left to retrieve leg shackles and put them on Collins.  (Doc. 47 ¶ 40(a); Doc. 57 ¶ 40(a)).

Defendants maintain that Collins cannot produce competent admissible evidence that Usher failed to intervene in any unreasonable use of force because he: (1) cannot produce competent admissible evidence that Usher witnessed another's use of excessive force; (2) cannot produce competent admissible evidence that Usher had a reasonable opportunity to intervene on any use of excessive force; (3) cannot produce competent admissible evidence that Usher refused to intervene; and (4) cannot produce competent admissible evidence that there was a realistic and reasonable opportunity to intervene.  (Doc. 47 ¶ 41(a)-(d)).  Collins counters that he "can produce admissible evidence that CO Usher failed to intervene in the unreasonable use of force through 'admissions on file[.]'" (Doc. 57 ¶ 41).

Facts Related to Exhaustion

DC-AMD 804 is the DOC's policy concerning inmate grievances and appeals.  (Doc. 47 ¶ 42; Doc. 57 ¶ 42).  Following September 27, 2022, Collins only filed three grievances while housed at SCI-Camp Hill.  (Id. ¶ 43).  The grievances filed during the relevant time period are numbers 1003760, 1003834, and 1003840.  (Id. ¶ 44).  Collins asserts that only grievance number 1003834 is relevant to the claims before the court.  (Doc. 57 ¶ 44).

Defendants assert that, of these three grievances, only one was appealed to the Secretary's Office of Inmate Grievance Appeals ("SOIGA")—number

1003834. (Doc. 47 ¶ 45). Collins asserts that he appealed two of these grievances to final review—numbers 1003840 and 1003834. (Doc. 57 ¶ 45).

## II.   <u>Legal Standard</u>

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality. See FED. R. CIV. P. 56(a). The burden of proof is upon the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F.Supp.2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also FED. R. CIV. P. 56(a), (e). Only if this threshold is met may the cause of action proceed. Pappas, 331 F.Supp.2d at 315.

## III.    Discussion

### A.    Administrative Exhaustion

Defendants first move for summary judgment based on Collins' failure to properly exhaust his claims.[2] (Doc. 48, at 7-11).

The Prison Litigation Reform Act ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under section 1983...by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Stated differently, the exhaustion of available administrative remedies is a prerequisite for a prisoner asserting a claim under Section 1983 regarding their prison conditions. See Rinaldi v. United States, 904 F.3d 257, 265 (3d Cir. 2018); see also Ross v. Blake, 578 U.S. 632, 638 (2016) (reiterating that the PLRA's "language is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies" (quoting Woodford v. Ngo, 548 U.S. 81, 85 (2006))); Jones v. Bock, 549 U.S. 199, 211 (2007) (stating that "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be

---

[2] In accordance with Paladino v. Newsome, 885 F.3d 203 (3d Cir. 2018), the court placed the parties on notice that it would consider exhaustion in its role as fact finder and afforded them the opportunity to be heard under Small v. Camden Cnty., 728 F.3d 265 (3d Cir. 2013). (Doc. 49).

brought in court" (citation omitted)); <u>Booth v. Churner</u>, 532 U.S. 731, 733-34 (2001) (stating that the PLRA "now requires a prisoner to exhaust 'such administrative remedies as are available' before suing over prison conditions" (quoting 42 U.S.C. § 1997e(a))).

"The PLRA requires proper exhaustion, meaning 'complet[ing] the administrative review process in accordance with the applicable procedural rules.'" <u>Downey v. Pa. Dep't of Corr.</u>, 968 F.3d 299, 305 (3d Cir. 2020) (alteration in original) (quoting <u>Woodford</u>, 548 U.S. at 88). "These procedural rules are supplied by the individual prisons." <u>Downey</u>, 968 F.3d at 305 (citations omitted); <u>see</u> <u>also</u> <u>Spruill v. Gillis</u>, 372 F.3d 218, 222 (3d Cir. 2004) (stating that "the determination [of] whether a prisoner has 'properly' exhausted a claim…is made by evaluating the prisoner's compliance with the prison's administrative regulations governing inmate grievances"); <u>Jones</u>, 549 U.S. at 218 (explaining that "[t]he level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim"); <u>Woodford</u>, 548 U.S. at 90 (indicating that "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules"). A prisoner's failure to follow a prison's procedural rules will result in a procedural default of their claims. <u>See</u> <u>Spruill</u>, 372 F.3d at 230-32 (concluding that PLRA's exhaustion requirement includes procedural default component); <u>see</u> <u>also</u> <u>Drippe v. Tobelinski</u>, 604 F.3d

12

778, 781 (3d Cir. 2010) (pointing out that Spruill held "that the PLRA includes a procedural default component and the determination whether a prisoner properly exhausted a claim is made by evaluating compliance with the prison's specific grievance procedures").  A procedural default may be excused, however, if the prisoner can show that the administrative remedies were unavailable to them. See Rinaldi, 904 F.3d at 266 ("The PLRA requires only 'proper exhaustion,' meaning exhaustion of those administrative remedies that are 'available.'" (quoting Woodford, 548 U.S. at 93)).  "Available means capable of use; at hand." Small v. Camden Cnty., 728 F.3d 265, 271 (3d Cir. 2013) (internal citations and quotation marks omitted).  "An administrative remedy is unavailable when it 'operates as a simple dead end[,]…is so opaque that it becomes, practically speaking, incapable of use, or when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'" Downey, 968 F.3d at 305 (alterations in original) (quoting Shifflett v. Korszniak, 934 F.3d 356, 365 (3d Cir. 2019)). "Although the availability of administrative remedies to a prisoner is a question of law, it necessarily involves a factual inquiry." Small, 728 F.3d at 271.

DC-ADM 804 describes the administrative remedies for inmate grievances. DC-ADM 804 defines a "grievance" as "[a] formal written complaint by an inmate related to a problem encountered during the course of his/her confinement."

Commonwealth of Pa., Dep't of Corr., Inmate Grievance Sys., Policy No. DC-ADM 804 ("DC-ADM 804"), Glossary of Terms, available at: https://www.pa.gov/content/dam/copapwp-pagov/en/cor/documents/about-us/doc-policies/804%20Inmate%20Grievances.pdf.

DC-ADM 804 provides a three-step grievance process that must be completed to properly exhaust administrative remedies in most cases. Id.; see also Booth v. Churner, 206 F.3d 289, 292 n.2 (3d Cir. 2002). If informal resolution attempts do not resolve the problem, the first step is to file a written grievance (using form DC-804, Part 1) with the Facility Grievance Coordinator within 15 working days after "the event upon which the claim is based." DC-ADM 804 § 1(A)(3)-(5). An adverse decision by the Grievance Coordinator may be appealed to the Facility Manager within 15 working days of the initial-review response or rejection. Id. § 2(A)(1). Finally, the decision of the Facility Manager may be appealed to "Final Review" with the Secretary's Office of Inmate Grievances and Appeals, and again must be submitted within 15 working days of the date of the Facility Manager's decision. Id. § 2(B)(1).

DC-ADM 804 has specific requirements for grievances submitted by inmates. Those requirements include, among other things, that the grievance "be legible [and] understandable"; "include a statement of the facts relevant to the claim" as well as "the date, approximate time, and location of the event(s) that

14

gave rise to the grievance"; that the prisoner "identify individuals directly involved in the event(s)"; and that the grievance include "the specific relief sought," including "compensation or other legal relief normally available from a court." Id. § 1(A)(11).

While housed at SCI-Camp Hill, after September 27, 2022 (the date of the incident at issue), Collins filed three grievances. (Doc. 47 ¶ 43; Doc. 57 ¶ 43). Of those three grievances, only one is relevant—number 1003834. (Doc. 57 ¶ 44). The history of that grievance is as follows.

On October 27, 2022, Collins filed grievance number 1003834, wherein he complained of the events of September 27, 2022. (Doc. 47-7, at 7-8). The grievance named Kiner and Snyder. (Id.). Initial review of this grievance was conducted on October 27, 2022. (Id. at 6). The Facility Grievance Coordinator rejected Collins' grievance, finding that he failed to comply with DC-ADM 804, as the grievance was not submitted within 15 working days of the events upon which the claims were based. (Id.). Collins appealed the first-level denial to the Facility Manager. (Id. at 3-5). The Facility Manager upheld the Grievance Coordinator's decision, again finding that Collins failed to comply with DC-ADM 804. (Id. at 3). Collins then appealed to SOIGA. (Doc. 47-2, at 6; Doc. 48-2, at 6). On final review, the Chief Grievance Officer dismissed the appeal and found

15

that Collins' grievance was properly rejected at the facility level as untimely filed.

(Id. at 2).  The Chief Grievance Officer found as follows:

> Your grievance was properly rejected at the initial level.  Upon appeal, you claim to have previously submitted a timely grievance but that it was discarded by an officer.  Although this cannot be substantiated, per the DC ADM 804 Section 1, a time extension for filing a grievance will be considered on a case-by-case basis.  The inmate must notify the Facility Grievance Coordinator of the reason for the delay, which you failed to do.

(Id.).

Two conclusions can be drawn from this grievance history.  First, Collins did not identify Usher and Schaeffer in his grievance as committing an act or omission that violated his constitutional rights.  (Doc. 47-7, at 7-8).  Collins only identifies Kiner and Snyder, and "numerous RHU staff members" and "numerous medical staff."  (Id.).  Although Collins did not specifically name Usher or Schaeffer, he seemingly referenced them as "staff members" and requested a list of all escorting officers involved in the incident.  (Id.).  It would thus be clear to prison officials that Usher and Schaeffer were involved in the escort on September 27, 2022.

Second, while Collins did appeal grievance number 1003834 to SOIGA, SOIGA dismissed the final appeal for failure to comply with DC-ADM 804.  As stated, Collins filed grievance number 1003834, which concerns the events of September 27, 2022.  (Doc. 47-7, at 7-8; Doc. 47 ¶¶ 44, 45; Dc. 57 ¶ 44).  Collins

16

signed the grievance on October 21, 2022, and the institution acknowledged receipt of the grievance on October 27, 2022. (Doc. 47-7, at 7-8). The Facility Grievance Coordinator rejected the grievance for failure to comply with DC-ADM 804 because it was not submitted within 15 working days of the events upon which the claims are based. (Id. at 6). Collins then appealed to the Facility Manager, who upheld the Facility Grievance Coordinator's initial rejection and concluded that "the Grievance Coordinator properly rejected [the] grievance as [the] grievance was not submitted timely." (Id. at 3-5). The Facility Manager specifically noted that the grievance "indicated an incident date of September 27, 2022. However, [the] grievance was not filed until October 27, 2022." (Id. at 3). Collins appealed the Facility Manager's decision to SOIGA, who dismissed the final appeal. (Id. at 2). The Chief Grievance Officer found that the grievance was properly rejected at the initial level because it was not submitted within the 15 working day window provided by DC-ADM 804. (Id. at 2). These facts are undisputed. Given the untimely filing of the initial grievance, defendants argue that Collins failed to properly exhaust all available administrative remedies regarding his present claims. (Doc. 48, 7-11). Collins, on the other hand, counters that his initial grievance was untimely because he previously submitted a timely grievance that was allegedly discarded by an officer. (Doc. 56, at 5; Doc. 57 ¶¶ 52-56). Furthermore, Collins asserts that he wrote to the Grievance

17

Coordinator on October 10, 2022, stating that he submitted a grievance related to the September 27, 2022 incident, and he wrote to SOIGA on October 20, 2022 stating that his grievance was discarded. (Doc. 56-1 ¶¶ 47-50; Doc. 57 ¶¶ 55-56). Collins claims that he never received a reply from either office. (Id.). In support, Collins has submitted purported copies of his letters to the Facility Grievance Coordinator and SOIGA. (Docs. 56-3, 56-4).

Given these submissions, the court concludes that a genuine issue of fact exists as to whether the grievance process was rendered unavailable to Collins such that his failure to exhaust certain grievances could be excused. See, e.g., Shifflett, 934 F.3d at 365 (concluding that "[a]s soon as a prison fails to respond to a properly submitted grievance or appeal within the time limits prescribed by its own policies, it has made its administrative remedies unavailable and the prisoner has fully discharged the PLRA's exhaustion requirement"). The court, therefore, declines to grant summary judgment on the basis that Collins failed to exhaust his administrative remedies. Accordingly, the court considers the merits of Collins' remaining claims below.

B.    Excessive Force Claim Against Kiner

In an Eighth Amendment excessive force case, the inquiry "is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 7 (1992). Not

18

"every malevolent touch by a prison guard" violates the Constitution. Id. at 9. "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" Id. (quoting Whitley v. Albers, 475 U.S. 312, 327 (1986)). To establish an Eighth Amendment excessive force claim, an inmate does not need to show that he suffered a significant, or even a more than de minimis, injury. Wilkins v. Gaddy, 559 U.S. 34, 37 (2010). Rather, the central issue is the force used by the officer, not the resultant injury. Flood v. Schaefer, 439 F. App'x 179, 182 (3d Cir. 2011).

When determining whether a prison official has used excessive force, the court must consider the following factors: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response. Whitley, 475 U.S. at 321; Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000).

Here, Collins' claim ultimately fails because there is insufficient evidence for a reasonable factfinder to conclude that the use of force was maliciously and

19

sadistically intended to cause harm to Collins. Rather, the evidence reveals that Collins' recalcitrant actions inspired the need to use force. The evidence further shows that this use of force incident was modest in scope, duration, and intensity, as Kiner did little more than hold down Collins in order to gain control of him.

The undisputed facts and videotape evidence demonstrate that: (1) Collins fought another inmate on September 27, 2022 (Doc. 47 ¶ 4; Doc. 57 ¶ 4); (2) OC spray was deployed to subdue the inmates (Doc. 47 ¶ 7; Doc. 57 ¶ 7); (3) officers arrived on the scene and Snyder supervised the escort of Collins while Usher operated the handheld camera (Doc. 47 ¶ 4(b)(i), (ii); Doc. 57 ¶ 4(b)(i), (ii)); (4) while in the medical department, Collins argued with officials about washing his eyes, threatened to spit in Snyder's face, and a spit hood was placed on Collins (Doc. 47 ¶¶ 11-13; Doc. 57 ¶¶ 11-13); (5) Collins was escorted to the RHU and an altercation ensued (Doc. 47 ¶ 17; Doc. 57 ¶ 17); (6) the officers attempted to resume the escort to the RHU, but Collins refused to walk (Doc. 47 ¶ 19; Doc. 57 ¶ 19); (7) medical again treated Collins by washing his face and placing ointment and a band-aid on his cheek (Doc. 47 ¶¶ 26, 27, 29-31; Doc. 57 ¶¶ 26, 27, 29-31); and (8) Collins was escorted to the RHU without further incident (Doc. 47 ¶ 33; Doc. 57 ¶ 33).

For the first and second Whitley factors, there is undisputed evidence of a need to use force, and a reasonable juror could not find that attempts to restrain Collins were unreasonable or excessive. The handheld video, with audio, commences with officers escorting Collins after a fight with another inmate. (Doc. 47-3, Handheld Video at 0:00:03). The officers first take Collins to the body scanner and then to be assessed by medical in a cell, without incident. (Id. at 0:00:20-0:06:20). Collins reported that he had facial injuries. (Id. at 0:14:04). A nurse poured solution in Collins' one eye, which he stated agitated his eye more. (Id. at 0:09:22-0:10:43). Because of the burning, Collins did not want the solution in his other eye. (Id. at 0:10:15). The nurse then cleaned Collins' face. (Id. at 0:12:16-0:14:10). The officers escorted Collins to the medical dispensary. (Id. at 0:17:10-0:20:46). The nurses wanted to wash Collins' eyes at the eye-wash station, but he did not want any more solution in his eyes and refused. (Id. at 0:21:11). Collins began arguing with Snyder and stated he is "about to spit in his face." (Id. at 0:22:39-0:22:40). Snyder explained that the eye-wash station is the protocol they follow and advised Collins to take it "easy" and "don't make it any worse." (Id. at 0:22:34-0:22:43). A spit hood was requested and placed on Collins' face, and the officers escorted him out of medical. (Id. at 0:24:35). During the escort, Collins and Kiner began arguing and Kiner states that Collins tried to grab his radio. (Id. at 0:25:40). Kiner told Collins to take it "easy," "calm

21

down," and "relax," and placed Collins against the wall. (Id.). Kiner repeatedly asked Collins if he was going to walk and advised him that he cannot turn around. (Id.). Kiner told Collins they were going to walk down the steps and stated, "we're not going to do nothing to you" and "we got you." (Id. at 0:26:30). Collins insisted that the officers were "'trying to do something" to him, but Kiner reassured him that "we got you, you're good." (Id.). As they began walking, Collins, Kiner, and Schaeffer fell to the ground and the officers instructed Collins to stop resisting. (Id. at 0:26:56). Once on the ground, the officers held Collins in place while shackles were retrieved, and Collins informed the officers that his "tooth came out." (Id. at 0:27:30). The officers again told Collins to "relax" while the shackles were placed on him. (Id. at 0:28:38). Collins told the officers he was dizzy and could not walk, and stated, "I'll fucking kill you," "I'm gonna fucking hurt one of y'all," and "I can't wait to catch this [guy]." (Id. at 0:28:25-0:29:32). He claimed that the officers jumped him. (Id. at 0:29:36). Snyder called for a nurse who arrived on the scene to conduct a medical assessment of Collins. (Id. at 0:28:48). The officers lifted Collins off the ground and blood can be seen on the spit hood. (Id. at 0:29:44). The officers escorted Collins back to medical without incident, and he informed them that his shoe was untied and "this is how this [ ] happened in the first place." (Id. at 0:30:00). A nurse washed Collins' face, put a band-aid on his cheek, and ordered an ice pack for his eye and lip.

22

(Id. at 0:31:18-0:41:05). The nurse noted that he had a "small split" on his lip, but it would not stitch well. (Id.). She also noted that there were no signs of any loose teeth. (Id.). Collins continued to threaten the officers and stated that he would "fucking kill" them. (Id. at 0:31:10-0:32:18). The officers placed a spit hood back on Collins and escorted him to the RHU without incident. (Id. at 0:41:00-0:44:22). After Collins was secured in the RHU, Kiner and another officer escorted Collins to medical for further assessment. (Id. at 0:57:27).

The videotape of the incident decisively refutes any claim that defendant Kiner applied force in an intentionally malicious or sadistic manner. See Jones v. Wetzel, 2017 WL 4284416, at *10 (M.D. Pa. Sept. 27, 2017) (granting summary judgment where videotape evidence "clearly undermine[d] any potential determination that [there] was a malicious or sadistic use of force."). Nothing in the movements or body language of Kiner supports an inference of malicious or intentional misconduct. Kiner was securing an inmate who just got into a fight with another inmate in an open area, refused to walk, and continued to resist the officers' efforts to escort him down the hallway. Kiner repeatedly told Collins to calm down and relax and assured him they were not going to do anything to him. Although not entirely clear on the video, Collins, Kiner, and Schaeffer appeared to slip or fall during this interaction, and Collins was immediately restrained on the ground face first by Kiner and Schaeffer. Defendant Kiner never struck

23

Collins and appeared to show restraint despite Collins' recalcitrance. Consequently, the first two factors weigh in favor of summary judgment.

The third Whitley factor considers the extent of the injury inflicted. It is undisputed that Collins sustained injuries as a result of this incident, including a cut on his cheek and lip and dizziness. (Doc. 47 ¶¶ 25, 31; Doc. 57 ¶¶ 25, 31; Doc. 56-15, at 1; Doc. 56-18, at 2-3). It is also possible that he chipped his teeth.[3] (Doc. 56-11, at 1; Doc. 56-12, at 1; Doc. 56-14, at 1; Doc. 56-15, at 1). The record does not support that Collins' injuries were de minimis. While Collins did suffer injuries during the incident, that factor alone is insufficient to overcome the ample evidence supporting the reasonableness of the application of force.

As to the fourth factor, there was a reasonable threat to the officers' safety, as well as other inmates' safety. The purpose in securing Collins was initially in response to a fight with another inmate. In response to this incident, defendant Kiner and other officers attempted to escort Collins to the medical department and RHU. Collins admits that he was fighting another inmate and refused to walk during the escort. (Doc. 57 ¶¶ 4, 20). The video of the incident also clearly shows that Collins threatened Kiner numerous times. Collins' actions put his own

---

[3] The dentist's medical assessment, dated September 29, 2022, notes that it is "[d]ifficult to assess whether these fractures were present before or after the altercation." (Doc. 56-11, at 1). In addition, the nurse that treated Collins immediately after the incident on September 27, 2022, noted that he did not have any loose teeth. (Doc. 56-14, at 1).

safety, as well as the officers' safety, at risk. Given Collins' disruptive behavior, defendant Kiner's response was objectively reasonable under the circumstances. This factor decidedly favors summary judgment.

As to the fifth factor, the record reflects that the force ceased when the officers regained control. Courts must bear in mind that drawing a line as to where force should cease must be approached practically, "'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,' making 'allowance for the fact that [ ] officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" Johnson v. City of Philadelphia, 837 F.3d 343, 350 (3d Cir. 2016) (quoting Graham v. Connor, 490 U.S. 386, 396-97 (1989)). This factor also supports summary judgment.

In summary, the record evidence would lead a reasonable trier of fact to find that defendant Kiner used the amount of force necessary to control Collins under the circumstances. Tindell v. Beard, 351 F. App'x 591 (3d Cir. 2009); see also Whitley, 475 U.S. at 319; Fuentes v. Wagner, 206 F.3d 335, 346 (3d Cir. 2000) (noting that even a prison officer's "over-reaction" to an inmate-caused disturbance would fall short of supporting a finding of excessive force where the totality of the circumstances indicated that the force was applied in a good faith

25

effort to maintain order).  No portion of the record supports an assertion that defendant Kiner acted maliciously or sadistically to cause harm.  In addition, Kiner never struck Collins.  Rather, he acted to gain control over an inmate that fought with another inmate and resisted officers.

The party adverse to summary judgment must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions.  Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460 (3d Cir. 1989).  Collins has failed to meet this burden.  He cannot rely on the allegations of the amended complaint to support his claims.  (See Doc. 57 ¶ 34(a); Doc. 57 ¶ 35).  It is clear on the record that defendant Kiner acted in a good faith effort to restore order and discipline.  Defendant Kiner is therefore entitled to an entry of summary judgment on Collins' Eighth Amendment excessive force claim.

C.    Failure to Intervene Claim Against Snyder, Schaeffer, and Usher

Collins asserts that defendants Snyder, Schaeffer, and Usher failed to intervene in the September 27, 2022 incident, in violation of the Eighth Amendment.  Correctional officers may be liable under Section 1983 for failing to intervene if they had "a reasonable opportunity to intervene and simply refused to do so."  Smith v. Mensinger, 293 F.3d 641, 650 (3d Cir. 2002).  A valid failure to

26

intervene claim requires: (1) the officer had a duty to intervene; (2) the officer had the opportunity to intervene; and (3) the officer failed to intervene. Id. at 650-51.

Because the court finds that there was no excessive use of force, this conclusion is also fatal to Collins' failure to intervene claim. As several courts have noted, "[i]f there is no excessive force, then there is no corresponding duty to intervene." Grubbs v. Marconi, 237 F.Supp.3d 181, 189 (D. Del. 2017). See also Nifas v. Coleman, 528 F. App'x 132, 135-36 (3d Cir. 2013) ("Because we find that no constitutional violation occurred with respect to excessive force, Nifas also cannot succeed on his failure to intervene claims."). Summary judgment is warranted on this claim.

D.    Qualified Immunity

Even if Collins had stated a colorable claim, defendants are nevertheless entitled to qualified immunity from this claim for damages. In order to establish a civil rights claim, Collins must show the deprivation of a right secured by the United States Constitution or the laws of the United States. However, government officials performing "discretionary functions," are insulated from suit if their conduct did not violate a "clearly established statutory or constitutional right[ ] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999).

27

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555 U.S. at 231. It "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). "Thus, so long as an official reasonably believes that his conduct complies with the law, qualified immunity will shield that official from liability." Sharp v. Johnson, 669 F.3d 144, 159 (3d Cir. 2012) (citing Pearson, 555 U.S. at 244). Although qualified immunity is generally a question of law that should be considered at the earliest possible stage of proceedings, a genuine dispute of material fact may preclude summary judgment on qualified immunity. Giles v. Kearney, 571 F.3d 318, 325-26 (3d Cir. 2009).

A qualified immunity determination involves a two-pronged inquiry: (1) whether a constitutional or federal right has been violated; and (2) whether that right was "clearly established." Saucier v. Katz, 533 U.S. 194, 201 (2001),

28

overruled in part by Pearson, 555 U.S. at 236 (permitting federal courts to exercise discretion in deciding which of the two Saucier prongs should be addressed first).

In the specific factual context of excessive force claims based upon allegations relating to a prisoner's handcuffing, or the use of OC spray, courts have acknowledged that, in certain instances, summary judgment is entirely appropriate. Gilles v. Davis, 427 F.3d 197, 207 (3d Cir. 2005). With respect to these particular excessive force claims, courts agree that: "[i]n these cases, summary judgment for an officer who claims qualified immunity is appropriate where, 'after resolving all factual disputes in favor of the plaintiff,[ ] the officer's use of force was objectively reasonable under the circumstances.'" Id. (citing Kopec v. Tate, 361 F.3d 772, 777 (3d Cir. 2004)).

Viewing the actions of defendants in the light depicted by the videotape, the court finds that defendants are entitled to qualified immunity. The force applied in this case was to gain compliance over an inmate that was fighting with another inmate and resisting officers. Thus, nothing in the measured and restrained conduct depicted in the video could have alerted defendants that their actions violated "clearly established statutory or constitutional rights of which a reasonable person would have known." Wilson, 526 U.S. at 609. Therefore, defendants are entitled to qualified immunity from damages in this case.

## IV.    Conclusion

Consistent with the foregoing, the court will grant defendants' motion (Doc. 46) and enter judgment in their favor.  A separate order shall issue.

BY THE COURT:

JUDGE JULIA K. MUNLEY
United States District Court

Dated:    June ___4___, 2026